FORSTER v. BATES.

5-1218                                    300 S. W. 2d 267

Opinion delivered April 1, 1957.

*Digby & Tanner,* for appellant.

*Terral & Rawlings,* for appellee.

CARLETON HARRIS, Chief Justice. Pauline Bates, a resident of Pulaski County, Arkansas, died intestate on or about April 19, 1955, leaving surviving her, Fred Bates, her husband, and her brothers, M. P. Forster II, Henry Forster, her sisters, Katherine Elizabeth McCumpsey, Clara Forster Pape, and her nephews and nieces, who were children of Gertrude Pinkerton, a de-

ceased sister[1]. At the time of her death, Pauline Bates was the owner of a certain eight acres, described in the complaint, located in Pulaski County, Arkansas. Title to this property had originally been held by her father, and subsequent to his death, the appellants herein quit-claimed their interest in said property to Mrs. Bates. Appellee constructed a house thereon, lived there with Pauline Bates until the time of her death, and continues to reside in said location. Following the death of his wife, appellee learned (according to his testimony) that title to the property had been held entirely in his wife's name, and that he presently held only a curtesy interest. Later he contacted an attorney, Mr. J. S. Abercrombie of Pulaski County, and subsequently proceeded to contact appellants. Mrs. McCumpsey, Henry Forster, and M. P. Forster II, accompanied appellee to Mr. Abercrombie's office at different times, and conveyed, by quitclaim deed, their interest in said property to appellee. The wives of the Forsters relinquished their rights of dower and homestead at the same time. This deed is dated June 3, 1955. Mrs. Clara Forster Pape, who was living in Chicago, refused to sign a similar deed, and on November 2, 1955, appellants filed suit in the Pulaski Chancery Court, asking that their deed be cancelled and that they, together with the other heirs of Pauline Bates, deceased, be declared the owners of the property. For grounds of cancellation, appellants alleged: "That the said defendant, Fred Bates, made certain misrepresentations and perpetrated a fraud upon the plaintiffs, and informed them that all heirs at law of his deceased wife, Pauline Bates, would convey subject property to him, individually." * * * "That there was no consideration for the deed of conveyance aforesaid by the plaintiffs to the defendant; that he obtained said deed of conveyance from them by misrepresentation and fraud; that he has not obtained the interest of the other heirs of Pauline Bates, deceased; and that the condition upon which said deed of conveyance from the plaintiffs to the defendant has failed." Appellee filed a general denial, and the cause proceeded to trial. At the conclu-

[1] Mrs. Pape and the nephews and nieces are not parties to this litigation. Appellee later obtained deed from all except Mrs. Pape.

sion of the hearing, the Court entered its decree, finding for the appellee, and dismissing the cause of action. From such decree comes this appeal.

The fraud, alleged by appellants, consists of the alleged statements of appellee and his attorney, purportedly made to appellants before they signed, that all other heirs of Pauline Bates would likewise convey their interest. The statements of appellants, however, are somewhat vague; for instance, Mrs. McCumpsey testified that while Judge Abercrombie made such a statement to her, she did not ask him as to where he obtained the information, asked no questions at all, just "read the deed and it seemed like it was right." It is difficult to understand a person deeding away her interest in property simply because she is advised by an attorney that the other heirs are deeding their interests, and not even asking a single question about it. Mr. Henry Forster was asked: "Q. What was it Judge Abercrombie asked you, if you recall? A. Well, the whole thing was misrepresented. Q. Will you tell the Court what was said? I believe that is a function of the Court to determine whether that is correct, but tell the Court what was said? A. I don't know very much. THE COURT: Answer his question, Mr. Forster. If you know tell him and if you don't know, say so. THE WITNESS: A. I don't know. MR. TERRAL: Q. Just a minute. Did Judge Abercrombie say anything? THE COURT: Do you recall anything Judge Abercrombie said? THE WITNESS: No." Appellee testified that, under the impression he held equal interest in the property with his wife, his entire life savings ($9,000) had been invested in building a home, that such expenditure would not have been made had he known the true situation, and when he learned that the deed was entirely in his deceased wife's name, he went to Mrs. McCumpsey, and she advised that he obtain a lawyer. She, at that time, indicated her willingness to sign and stated that she would contact Mrs. Pape in Chicago. Appellee testified that he talked with the other appellants and each agreed to sign the deed. Both appellee and Judge Abercrombie testified that the latter explained to Mrs. McCumpsey

that Mr. Bates felt that since he had placed a $9,000 home upon unimproved property, under a mistaken belief, for appellee and his deceased wife to live in, he (appellee) was entitled to the property, and Judge Abercrombie asked Mrs. McCumpsey if she thought "it would be the will of your deceased sister that he should have the property." To this question, Judge Abercrombie stated that she answered "Yes," and proceeded to sign the deed. Judge Abercrombie further testified that before each appellant signed, he made the same explanation and asked the same question, and that the only representation he made as to whether Mrs. Pape would sign the deed was that Mrs. McCumpsey had said that she would do so. Mrs. McCumpsey denied such a conversation, and stated that she had never communicated with her sister about the deed. When asked as to whether or not she had talked over the phone with her about signing, she replied, "I don't remember,"; however, a letter placed in the record from Mrs. Pape to Mr. Bates, dated July 10, 1955, contained the following: "* * * Writing you about the papers that you sent me to sign when I called Katy I did say that I would sign if the clause was put in about the bauxite. * * *"

One of the strongest arguments supporting appellee's position relates to the fact that though the deed in question was signed in June, 1955, not a single one of the appellants endeavored to contact appellee or saw fit to complain that they had signed the deed because of misrepresentation; in fact, they filed their complaint without discussing the alleged fraud[2] with him. The record reflects the following testimony from appellant, Mr. M. P. Forster, II. "THE WITNESS: I have not seen him. I have not seen him, I reckon, over one time since this happened. MR. TERRAL: Q. Where

---

[2] Mrs. McCumpsey, after testifying that she had not discussed the signing of the deed with appellee, in later testimony stated that she talked about the deed when appellee came to her house in September. She did not testify as to what was said. Appellee testified that she said, "Fred, after studying it over and considering it, we have decided that I want my deed back. We are willing that you live there on the place the rest of your life, and we will treat you nice, and you can marry anybody you like, but when you are dead, we want the property to go back to us."

was that? A. I passed him on the road. Q. Just passing on the road? A. That is right, sir. Q. Did you try to find him? A. No, sir. Q. Why didn't you? A. It wasn't none of my business. What did I want to look him up for? THE COURT: Just answer his questions. MR. TERRAL: Q. I think your statement is well made. You had deeded your interest in some property to him under a misrepresentation from him and Mr. Abercrombie, is that correct? A. That is right. Q. And you had no interest in getting him to correct that? A. No, sir. Q. You had no interest in getting him to deed it back to you? A. I don't know.''

Certainly it cannot be said that these appellants reacted in the normal manner of one who has been deprived of his property because of fraudulent representation. One would expect that appellants would have ''beaten a path to the door'' of appellee, demanding an explanation for the false and fraudulent statement, and clamoring for a return of the deed. Their failure to complain, of course, lends weight to appellee's argument that no such representation was made. Had appellants intended to sign only if Mrs. Pape signed, it would have been simple enough for them to have merely postponed their execution of the deed until the deed from Mrs. Pape (the only non-resident involved) had been returned[3]. We accordingly do not agree that the deed was invalid because a condition precedent was not fulfilled, nor can we conclude that it was signed because of a mistaken belief that all heirs would convey. It simply appears that appellants, because of the fact that appellee was the husband of their deceased sister and was accordingly looked upon ''as one of the family,'' and had invested his life savings in constructing the home in which their sister had lived, felt that he was morally entitled to the property, and accordingly signed the deed. Subsequent thereto, they had a ''change of heart'' and regretted having conveyed their interest.

---

[3] There was testimony to the effect that Henry Forster's wife remarked: "Do you reckon we should sign these deeds before Clara signs them?"

The result of the lawsuit, of course, hinges upon whether or not fraudulent statements were made by appellee and his attorney, which induced appellants to execute the deed. The quantum of proof required to justify a court in setting aside a deed because of fraud, in this state, is so well known as to hardly require the citing of authority. Such proof must be clear, cogent, and convincing. *Penney* v. *Long,* 210 Ark. 702, 197 S. W. 2d 470; *Morris* v. *Cobb,* 147 Ark. 184, 227 S. W. 23. The testimony in this case falls far short of that required.

The decree is accordingly affirmed.